# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **JULIUS KEVIN EDWARDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:06CV607** |
| | ) | |
| **HIGH POINT POLICE** | ) | |
| **DEPARTMENT, MARK R. CURRY,** | ) | |
| **CANINE "MAX," BRAD TENNANT,** | ) | |
| **and UNKNOWN OFFICER (Assisted),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court for a ruling on a number of motions filed by the parties, including summary judgment motions. These motions are: Plaintiff's motion for summary judgment (Pleading No. 19); Plaintiff's motion for leave to amend memorandum of law (Pleading No. 47); the renewed motion for summary judgment of Defendants Mark R. Curry and Brad Tennant (Pleading No. 64); the renewed motion for summary judgment of Defendant the City of High Point ("the City") (Pleading No. 66); Plaintiff's second motion for appointment of counsel (Pleading No. 69); Plaintiff's motion to compel discovery (Pleading No. 70); Plaintiff's motion for leave to amend and renewed motion for summary judgment (Pleading No. 75); and Plaintiff's motion for judgment by default (Pleading No. 82). The briefing is completed on these motions, and the motions are ready for a ruling.

In this civil action under 42 U.S.C. § 1983, Plaintiff Julius Kevin Edwards, a prisoner of the State of North Carolina, alleges that the Defendants violated his rights by using excessive force against him during his arrest on September 9, 2003 in High Point, North Carolina. Specifically, Plaintiff alleges that the Defendants used or allowed the use of excessive force in that canine "Max," a police dog, was under the control of the individual Defendants and was permitted to attack Plaintiff under circumstances in which such attack was unjustified and unnecessary. Pursuant to the December 26, 2007 Order of Chief Judge James A. Beaty (Pleading No. 63), Plaintiff's purported claims against Defendants under 42 U.S.C. §§ 1985 and 1986 were dismissed, and all claims against canine "Max" were dismissed. The case proceeds against Defendants Curry, Tennant, and the City on Plaintiff's claim under 42 U.S.C. § 1983. By Order of the undersigned on August 14, 2007 (Pleading No. 50), the parties were permitted to file renewed motions for summary judgment after completion of a period of discovery that was to end on December 15, 2007. The parties have now filed such renewed motions.

## Non-dispositive Motions

The Court will first address the motions filed by *pro se* Plaintiff Edwards. Plaintiff has requested appointment of counsel (Pleading No. 69) although the Court has previously denied an identical request. *See* Pleading Nos. 49 and 54. The Court again **DENIES** appointment for reasons stated by the Court in its Order of September 13, 2007. (Pleading No. 54.)

-2-

Plaintiff Edwards has also filed a motion to compel discovery. (Pleading No. 70.) Therein, Plaintiff requests that Defendants be ordered to provide (1) all photographs of Plaintiff's wounds (lower leg and knee down), and (2) medical records of "canine Max." In response to the motions, Defendants Curry, Tennant, and the City contend that Plaintiff failed to comply with the federal and local rules which require that a party attempt to confer regarding a discovery dispute before filing a motion to compel discovery. *See* Fed. R. Civ. P. 37 and LR37.1. Additionally, Defendants show that they have produced 12 photographs of Plaintiff taken at the hospital following his arrest, and they attest that they have no other responsive photographs in their possession. With regard to veterinary records concerning canine Max, Defendants attest that they have no responsive records in their possession since Max has now been retired from duty. Nonetheless, counsel for the City obtained the pertinent records directly from Total Care Veterinary Hospital (which is beyond the City's legal obligation under the federal rules) and submitted the records to Plaintiff. The Court finds that Plaintiff is entitled to no remaining discovery under his motion to compel, and the motion is **DENIED**.

On January 24, 2008, Plaintiff filed a document he styled "Motion for Leave to Amend Rule (15) Plaintiff's Renewed Memorandum of Law in Opposition to Defendants' 'Motion for Summary Judgment': Rule 7.2 Pursuant to Rule 56." (Pleading No. 75.) Review of the document shows that Plaintiff makes no request to amend his pleadings, but simply requests that the Court accept the document as a renewed motion for summary judgment on

his behalf and a renewed opposition to Defendants' summary judgment motions. The Court accepts the pleading as a motion and memorandum in support of summary judgment for Plaintiff and in opposition to summary judgment for Defendants. The pleading requires no ruling at this point in the Court's consideration of pending non-dispositive motions. The Court will address Plaintiff's motion and arguments below, when deciding the summary judgment issue.

Plaintiff has filed a motion for entry of a default against Defendants. (Pleading No. 82.) The motion is **DENIED** as meritless. Defendants Curry, Tennant, and the City have timely answered the Complaint and have defended actively at every stage of the litigation. *Cf.* Fed. R. Civ. P. 55 ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the clerk shall enter the party's default.") Plaintiff's "theory" for default is difficult to decipher, but it is related to the February 7, 2008 motion to withdraw by defense counsel Patricia Carole Perkins from representation of Defendants in this action. That motion to withdraw is of no significance, however, and certainly forms no basis for entry of a default, since all Defendants have been represented by the law firm of Smith Moore LLP from the time of Defendants' first appearances (Pleading Nos. 9 - 16), and they continue to be represented by the firm. The status of Ms. Perkins in particular, who apparently left the firm during the pendency of this case, is irrelevant to Smith Moore's status as defense counsel throughout the case. The motion for entry of a default is **DENIED**.

-4-

## Summary Judgment Motions

The Court turns to the cross-motions for summary judgment. (Pleading Nos. 19 and 75, 64 and 66.) The parties have supported their motions with affidavits and exhibits.

### A.    Standard of Review

A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *cert. denied,* 481 U.S. 1029 (1987). A mere existence of a scintilla of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252.

-5-

Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id*. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

**B.     Factual Showings Made by the Parties**

Defendants have presented several affidavits, exhibits, and discovery responses in support of their motions for summary judgment. Taken together, these records, competent for consideration on summary judgment review, tend to show the following.

On September 9, 2003, a Dollar General manager made a 911 call reporting an armed robbery at his store. In response to that call, Defendant Tennant, a patrol officer and field trainer, and Defendant Curry, a canine officer and trainer, and his police canine, Max, were dispatched to the suspect's last known location. (Pleading No. 39, 2nd Affidavit of Mark R. Curry ("Curry Aff.") ¶ 12; Pleading No. 40, 2nd Affidavit of Brad Tennant ("Tennant Aff.") ¶ 7.) Tennant and Curry learned that the suspect, later identified as Plaintiff Julius Kevin Edwards, was armed with a long bladed knife used in the robbery and was fleeing down a street behind the store into a heavily wooded area. (2nd Curry Aff. ¶ 12; 2nd Tennant Aff. ¶ 7-8; Pleading No. 33, Affidavit of Nancy G. Williams (Williams Aff.") Ex. A at 1, 4.)

After arriving at the scene, Curry put Max on a lead—a thick nylon leash—and gave him the command to "track" into the wooded area. (2nd Curry Aff. ¶ 14; 2nd Tennant Aff. ¶ 9.) The track command, like all commands given by Curry to Max, was in a foreign

language not common in this area in order to minimize the risk that a subject might give Max a counter command. (2nd Curry Aff. ¶ 8.) Curry had used the same track command on numerous prior occasions to instruct Max to locate individuals suspected of criminal activity, lost children, or disoriented people. (*Id*. ¶ 9.) The track command instructed Max to locate the subject using his sense of smell. (*Id*.) It did not instruct Max to bite the subject. (*Id*.)

When Curry gave the track command, Max entered the woods on the lead ahead of Curry. (2nd Curry Aff. ¶ 14; 2nd Tennant Aff. ¶ 9.) Tennant followed behind Curry, acting as a cover officer, providing a lookout for threats to the safety of Curry and Max. (*Id*.) Tennant was not a canine handler and did not have the ability to exert any control over Max. (2nd Tennant Aff. ¶ 9.)

Max pulled hard on his lead taking Curry and Tennant through the dense woods at a rapid pace. (2nd Curry Aff. ¶ 16.) Curry and Tennant arrived at a narrow clearing where the woods ended and a thick area of kudzu began. (2nd Curry Aff. ¶ 16-17; 2nd Tennant Aff. ¶ 10.) The kudzu covered the uneven ground and climbed the stalks or trees creating deep, hidden pockets. These pockets were knee deep in some places and deeper in others. (2nd Curry Aff. ¶ 16; 2nd Tennant Aff. ¶ 11.) Max pulled very hard on the lead indicating that the suspect had continued into the kudzu. (2nd Curry Aff. ¶ 17.) Curry and Tennant were keenly aware of the risk that Plaintiff was armed with a knife and could be in a position to attack them or Max so long as Plaintiff remained concealed in the kudzu. (2nd Curry Aff. ¶ 17; 2nd Tennant Aff. ¶ 11.) Curry, therefore, stopped Max at the edge of the kudzu in an

-7-

effort to focus on a particular area and to determine the safest way to enter. (2nd Curry Aff. ¶ 17-18; 2nd Tennant Aff. ¶12.) At this point, Tennant advised all units to hold radio traffic because it appeared that Plaintiff was in the kudzu. (2nd Curry Aff. ¶ 17; 2nd Tennant Aff. ¶ 10; Williams Aff. Ex. A at 4.) The track had moved so rapidly that it took a little more than three minutes from the time the track began to the time Tennant requested the hold on radio traffic. (*Id*.)

Curry gave Max a second command to track with the expectation that Max would move into the kudzu, identifying a safe path for the officers to follow. (2nd Curry Aff. ¶ 18.) The kudzu was so thick that Max disappeared from sight. (2nd Curry Aff. ¶ 19; 2nd Tennant Aff. ¶ 12.) Plaintiff then yelled to get the dog away from him. (2nd Curry Aff. ¶ 19; 2nd Tennant Aff. ¶ 13.) From Tennant's position to the side of Curry, Tennant observed Plaintiff briefly jump up from his concealed position and quickly return to the cover of the kudzu. (2nd Tennant Aff. ¶ 13.) Curry immediately pulled Max back by his lead. (2nd Curry Aff. ¶ 19.) Max returned to Curry in such a way and with such speed that it seemed most likely that Max had not bitten Plaintiff. (*Id*.)

While pulling Max back, Curry pointed his weapon in the direction of Plaintiff's yell and began issuing commands for Plaintiff to surrender and show his hands and warning that if Plaintiff did not show his hands that Curry would release Max to engage Plaintiff. (2nd Curry Aff. ¶ 20; 2nd Tennant Aff. ¶ 14.) Tennant pointed his weapon towards the location where he observed Plaintiff briefly jump up. (2nd Tennant Aff. ¶ 13.) Tennant initially

-8-

issued commands for compliance as well, but stopped so that Curry could continue with his commands. (*Id.* ¶ 14.) Concerned that Plaintiff was armed, Curry (and initially Tennant) repeatedly ordered Plaintiff to show his hands. (2nd Curry Aff. ¶ 20; 2nd Tennant Aff. ¶¶ 13-15.) Curry warned that if Plaintiff did not comply with his commands, Max would be ordered to engage him. (2nd Curry Aff. ¶¶ 20-21.) It is undisputed that Plaintiff did not come out from the kudzu with his hands visible. (2nd Curry Aff. ¶ 20; 2nd Tennant Aff. ¶ 14.) Plaintiff's submissions to this Court state only that Plaintiff "complied when first confronted by not attempting to run any further," not that he came out of hiding or made his hands visible. (Pleading No. 20, Pl.'s Supp. Br., Affidavit of Julius Kevin Edwards ("Pl.'s Aff.") ¶ 2.)

Because of Plaintiff's noncompliance, Curry gave Max the command to apprehend, which was a command to engage or bite Plaintiff. (2nd Curry Aff. ¶¶ 10, 21.) After giving Max the command to apprehend, Curry repeatedly yelled commands for Plaintiff to place his hands on his head stating that he knew Plaintiff was armed. (2nd Curry Aff. ¶¶ 20-21; 2nd Tennant Aff. ¶ 14.) Curry told Plaintiff that he would remove Max when Plaintiff complied with his commands. (2nd Curry Aff. ¶ 21; 2nd Tennant Aff. ¶ 15.) During these events, Tennant and Curry were both moving into positions to better see Plaintiff. (2nd Curry Aff. ¶ 22; 2nd Tennant Aff. ¶ 15.) Tennant saw that Max had engaged Plaintiff's leg and that Plaintiff was struggling in the kudzu. (2nd Tennant Aff. ¶ 15.) However, Tennant could not see both of Plaintiff's hands and was concerned that he might attempt an attack with his

knife. (*Id*.) Contemporaneously, Curry reached a position where he could see Plaintiff's hands and the back pockets of his pants. (2nd Curry Aff. ¶ 22.) When Curry did not immediately see a knife, he approached Plaintiff intending to remove Max. (2nd Curry Aff. ¶ 22.) As Curry moved toward Plaintiff, Plaintiff began striking Max with his hands and feet. (2nd Curry Aff. ¶ 22; 2nd Tennant Aff. ¶ 15; Pleading No. 2, Complaint ("Compl.") ¶ V ¶ 2.) With Plaintiff engaged in this conduct, both of his hands were no longer visible. (2nd Curry Aff. ¶ 22.) Curry no longer felt that he could safely remove Max. (*Id*.) Curry stopped his approach and commanded Plaintiff to stop hitting Max and to make his hands visible. (*Id*.) While Plaintiff was striking Max, Max briefly lost his hold on the Plaintiff, but immediately regained it. (2nd Curry Aff. ¶ 23.)

At this point, Plaintiff was flailing, and Curry believed Plaintiff was no longer fighting Max and that he could safely approach. (*Id*.) Curry informed Tennant of this and moved to place one handcuff on Plaintiff while ordering him not to move as he removed Max. (2nd Curry Aff. ¶ 24; 2nd Tennant Aff. ¶ 16.) After Curry physically removed Max, Tennant finished handcuffing Plaintiff who was then escorted to a patrol vehicle. (*Id*.) Curry checked Max for stab wounds and injuries sustained from Plaintiff's striking. (2nd Curry Aff. ¶ 26.)

Defendants describe a course of events that moved very quickly. Just one minute and thirty-six seconds elapsed from Tennant's request to hold radio traffic until Plaintiff had been handcuffed. (Williams Aff., Ex. A at 4; 2nd Curry Aff. ¶ 25; 2nd Tennant Aff. ¶ 17.) Following his arrest, Plaintiff was transported for medical evaluation and treatment.

(Williams Aff., Ex. A at 4.)  After Plaintiff's arrest, his knife was found in the kudzu where he had been arrested.  (2nd Curry Aff. ¶ 27; 2nd Tennant Aff. ¶ 18.)  It was located easily within Plaintiff's reach while he was hiding, during his altercation with Max, and at the time of his arrest.  (*Id.*)

Plaintiff, for his part, has given statements of fact in several of his pleadings with the Court.  In his Complaint, Plaintiff states that on September 9, 2003, at approximately 4:23 p.m, while "lying in a wooded area," he was approached by canine "Max" who was lead by Defendant Curry, with other officers present.  He then alleges that "[w]here upon in the process of the Plaintiff rising up canine "Max" viciously attacked."  According to Plaintiff's Complaint, the officers at the scene laughed during the encounter.  (Compl. ¶ V.)  Curry ordered Plaintiff to lie down with his hands behind his head.  Plaintiff says this was "virtually impossible" for him because of Max's attack.  Max continued mauling him, and Plaintiff struggled to free himself so he could comply.  Plaintiff alleges that Defendant Curry continued to "set loose" Max until he noticed that other patrol cars were pulling into the area. (*Id.*)  In an addendum to the Complaint, Plaintiff adds that during the encounter he attempted to get up, rather than lying down as ordered, only because he heard Defendant Curry again command Max to attack.

Plaintiff filed an affidavit on November 21, 2006.  (Pleading No. 20, Pl.'s Aff.)  He says that Defendants "could've easily apprehended the Plaintiff and prevented 'Max' from attacking and mauling him . . . Yet the defendants encouraged the acts and laughed while

holding the Plaintiff at gunpoint . . ." (*Id*. ¶ 2.) He added that "Plaintiff complied when first confronted by not attempting to run any further . . . ." (*Id*.)

Discussion

Plaintiff's principal claim in this action is that Officers Curry and Tennant, by and through their use and control of canine Max, used excessive force in effecting his arrest on September 9, 2003. Such a claim is analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *see also Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998)(applying *Graham* objective reasonableness standard to an excessive force claim involving use of a police canine). The issue is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. The reasonableness of the force used is to be judged from the view of a reasonable officer on the scene and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Whether the officer has good or evil intentions has no bearing on the objective reasonableness of the level of force used. *Id.* In determining whether excessive force was used while apprehending a suspect, a four-part test may be employed. *See Tennessee v. Garner*, 471 U.S. 1, 8-12 (1985). Each situation must be judged by (1) the severity of the crime the suspect is believed

-12-

to have committed, (2) the threat he poses to the safety of officers or others, (3) whether he is actively resisting or evading arrest, and (4) whether, if feasible, a warning was issued. *Id.*

The Court's first task on summary judgment review is to determine whether, viewing the facts most favorably to Plaintiff, Defendant Curry or Tennant violated a constitutional right held by Plaintiff. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is no, the analysis is at an end. If the answer is yes, the Court must consider whether the constitutional right was clearly established and whether it would be clear to a reasonable officer that the officer's conduct was unlawful. *Id.* at 201-02; *see also Gomez v. Atkins*, 296 F.3d 253 (4th Cir. 2002).

The Court will apply the four-part test of *Tennessee v. Garner*, to the facts of this case, taken in the light most favorable to Plaintiff Edwards. The first factor for consideration is the severity of the crime the plaintiff is believed to have committed. It is undisputed here that the officers were informed that Plaintiff Edwards had just committed an armed robbery and was still in possession of the long knife brandished during the robbery. As to the second factor, it is established without contradiction that Plaintiff, from the vantage point of an objective officer, posed an immediate threat to the safety of the officers who were pursuing him. Plaintiff begins the statement of his claim in his Complaint with the words "On Sept. 9th, 2003 at approximately 4:23 p.m., while lying in a wooded area . . . the Plaintiff was approached by canine "Max". . . . (Compl. ¶ V.) His description that he was "lying in a wooded area" is entirely without context in the Complaint, but it is supplemented

-13-

considerably by Defendants' affidavits, which Plaintiff has not disputed on this point. In fact, Plaintiff was hiding in a deep pocket of kudzu and could not be seen by the closely approaching officers. A reasonable officer in Defendants' position would have understood that Plaintiff posed a great danger of harm, as he was reported to have just committed an armed robbery, was concealed in the foliage, and still possessed a deadly weapon. Without question, the situation was tense and uncertain.

The third factor is whether the plaintiff actively resisted or attempted to evade arrest. Plaintiff says that he complied with the verbal directives of the officers "by not attempting to run any further." Of course, this statement does not show compliance with the uncontradicted directive given by the officers to Plaintiff to "show his hands." Nothing in Plaintiff's factual showing suggests that he took an initial action, before Defendant Curry ordered Max to engage Plaintiff, that demonstrated substantial compliance with the officers' demands. Plaintiff did nothing to diffuse the imminent threat of danger to the officers.

The fourth factor of the *Tennessee v. Garner* test is whether the officers warned Plaintiff that they were going to use canine Max to seize Plaintiff if he did not comply by identifying his location and raising his hands. The officers attest that they gave repeated warnings. Plaintiff does not deny this, and his statement that he "complied" by not running any farther is an implicit recognition that he was warned and given an opportunity to comply.

Application of the four-part test for reasonableness in the use of force demonstrates conclusively that a reasonable officer in the position of Officers Curry and Tennant would

-14-

have believed that use of force – the command to canine Max to engage and seize Plaintiff – was justified under the circumstances of this case. Nor could there be any basis for a finding that the use of force became excessively prolonged at some point. Defendants attest that Plaintiff was fighting canine Max. They knew Plaintiff had a weapon and they could not see his hands. Plaintiff describes that he was "struggling" with canine Max. The entire incident took place in a matter of seconds, as the undisputed record shows that only one minute and thirty-six seconds passed from the time Defendants approached Plaintiff closely to the time he was handcuffed and taken into custody. (2nd Tennant Aff. ¶ 25.)

Plaintiff alleges that Defendants "laughed" while Plaintiff was attempting to fight off Max. Defendants deny this. Nonetheless, the subjective good faith or bad faith of the officers is not relevant to the issue of the objective reasonableness of their use of force. *Graham*, 490 U.S. at 396-97.

Plaintiff, through photographs attached to his pleadings, shows that he suffered significant bite wounds as result of his being seized by canine Max. This is, of course, regrettable and unfortunate. Nonetheless, in view of the severe threat Plaintiff posed to Defendants Curry and Tennant and the undisputed record that he did not comply with directives given by the officers to defuse the threat, Defendants were justified in using the degree of force employed here against Plaintiff. Neither Officer Curry nor Officer Tennant violated Plaintiff's Fourth Amendment rights in this case.

Defendant Tennant is entitled to summary judgment on the additional ground that it is undisputed that he had no means to control canine Max. Defendant Tennant was not a canine handler. Max was trained to respond to commands in a foreign language, so that suspects could not give counter-commands. Defendant Tennant was providing cover to Defendant Curry, but at all times canine Max remained in the exclusive control of Curry. (2nd Curry Aff. ¶ 8; 2nd Tennant Aff. ¶ 9.)

A finding of no constitutional violation by the defendant officers, viewing the evidence most favorably to Plaintiff, ends Plaintiff's case. The court notes, however, that even assuming for argument that a violation could be found, Defendants Curry and Tennant would nonetheless be entitled to judgment in their favor on the basis of qualified immunity. Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992); *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Here, it is apparent that Defendants Curry and Tennant could reasonably have believed that their action in using the particular amount of force directed toward Plaintiff in this case was reasonable in view of the controlling Fourth Amendment authority discussed above.

The failure of Plaintiff's Fourth Amendment claim against Defendants Curry and Tennant causes his claim against Defendant the City of High Point to fail as well. Plaintiff alleges that the City failed to properly train its officers, including Curry and Tennant, and therefore is legally responsible for the officers' use of excessive force. *See generally Monell*

-16-

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *City of Canton v. Harris*, 489 U.S. 378 (1989).

The claim against the City is purely derivative of the claim against the individual officers.

*See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996); *Turpin v. County of Rock*,

262 F.3d 779, 784 (2nd Cir. 2001). Since the officers cannot be found to have violated any

right held by Plaintiff Edwards, the City of High Point cannot be found liable to Plaintiff

under any theory recognized in law.

Conclusion

For reasons set forth above, **IT IS ORDERED** that Plaintiff's non-dispositive motions

(Pleading Nos. 69, 70, and 82) are **DENIED**.[1]

Further, **IT IS RECOMMENDED** that the summary judgment motions of Plaintiff

(Pleading No. 19 and 75) be denied, that the summary judgment motions of Defendants

(Pleading Nos. 64 and 66) be granted and that this action be dismissed with prejudice.


/s/ P. Trevor Sharp
United States Magistrate Judge

Date: March 25, 2008

---

[1] Plaintiff has filed a motion for leave to amend a brief he had previously filed. (Pleading No. 47.) This motion is **GRANTED**.

-17-